## UNITED STATES DISTRICT COURT

_____NORTHERN_____ DISTRICT OF ___ILLINOIS, EASTERN DIVISION___

**F I L E D**   **08CR**   **415**

UNITED STATES OF AMERICA

v.

PETER G. ROGAN

MAY 2 3 2008
May 23, 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**CRIMINAL COMPLAINT**

**CASE NUMBER:**

**MAGISTRATE JUDGE ASHMAN**

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my

knowledge and belief. On or about _____December 21, 2006_____ in _____Cook_____

county, in the __Northern__ District of _____Illinois_____ defendant did

willfully subscribe as true a material matter that he did not believe to be true, to wit, that he did not have and never had any control regarding the "Peter G. Rogan Irrevocable Trust 001" and its income, distributions, or assets and that he did not readily have access to the assets of the Trust, said assertions being made in an affidavit made under the penalty of perjury as permitted under Section 1746 of Title 28, United States Code, and said affidavit filed with the United States District Court for the Northern District of Illinois in the matter captioned *United States of America v. Peter Rogan*, No. 02 C 3310;

and that said defendant did

knowingly and corruptly endeavor to influence, obstruct and impede the due administration of justice in the post-judgement proceedings pending before the United States District Court for the Northern District of Illinois in the matter captioned *United States v. Rogan*, No. 02 C 3310, in that he filed and caused to be filed said sworn affidavit containing said false assertions

in violation of Title _____18_____ United States Code, Sections ___1621 and 1503___ .

I further state that I am a Special Agent with the Federal Bureau of Investigation and that this complaint is based on the following facts:

See attached affidavit of Special Agent Kray Te.

Continued on the attached sheet and made a part hereof:  _X_ Yes   _____ No

Signature of Complainant  Special Agent Kray Te

Sworn to before me and subscribed in my presence,

_May 23, 2008_
Date

at   Chicago, Illinois
City and State

_____
Magistrate Judge Martin C. Ashman
Name & Title of Judicial Officer

_____
Judge Martin C. Ashman

STATE OF ILLINOIS    )
                            ) ss

COUNTY OF COOK    )

## AFFIDAVIT

I, Kray Te, being duly sworn on oath, hereby depose and state the following:

1.    I have been employed as a Special Agent for the Federal Bureau of Investigation since 2004. For approximately the past four years, I have been assigned to the Chicago Division, and have investigated white collar matters, including fraud cases.

2.    The information contained in this affidavit is based upon personal knowledge derived from information I have received from other law enforcement agents, my review of interview reports and bank, financial, corporate, trust, court, and other records, and my participation in witness interviews. Statements included in this affidavit are set forth in substance and in part, and are not verbatim. This affidavit is submitted for the limited purpose of establishing probable cause to support the attached criminal complaint charging Peter G. Rogan with perjury and obstruction of justice in violation of Title 18, United States Code, Sections 1621 and 1503. Due to its limited purpose, I have not included all of the information that I know about this investigation or the entities, individuals, and events described in this Affidavit.

## SUMMARY

3.    In summary, the evidence available to date in the ongoing investigation shows that in January 1996, Peter G. Rogan established a Trust in the Bahamas, known as the "Peter G. Rogan Irrevocable Trust 001" or the "Peter G. Rogan Trust" (hereafter the "Trust"). In September 2006, the United States District Court for the Northern District of Illinois entered a judgment against Rogan and in favor of the United States in the amount of $64,259,032.50, after

1

the United States prevailed in a civil action brought against Rogan in 2002 and alleging that

Rogan defrauded the government by submitting fraudulent claims for reimbursement under the

Medicare and Medicaid programs in connection with his operation of the former Edgewater

Medical Center in Chicago.  In connection with proceedings brought by the United States to

enforce this judgment (toward which Rogan has made no payments to date), Rogan subscribed an

affidavit under penalty of perjury, which he filed and caused to be filed in the United States

District Court for the Northern District of Illinois on December 21, 2006.  In that affidavit,

Rogan represented that he never exercised control over the Trust and its income or assets, that he

had no control over distributions from the Trust, and that he did not readily have access to the

assets of the Trust.  As demonstrated by the evidence set forth below, those representations were

false; in fact, Rogan did readily exercise control over the Trust and its income, distributions

and/or assets, and Rogan readily had access to the assets of this Trust.

## PETER G. ROGAN ESTABLISHES THE PETER G. ROGAN IRREVOCABLE TRUST

4.    The Trust was established on January 5, 1996 with the Trustee, an entity known as

New World Trustees (Bahamas) Limited (hereafter "New World"), which served as Trustee.

Subsequently, New World became a part of Oceanic Bank and Trust Ltd. (Bahamas) (hereafter

"Oceanic"), whereupon Oceanic assumed the role of Trustee.  In late 2007 and early 2008,

Oceanic produced records relating to this Trust in response to a subpoena served upon it by the

United States in connection with a civil case pending in post-judgement proceedings before the

United States District Court for the Northern District of Illinois, captioned *United States of*

*America v. Peter Rogan*, No. 02 C 3310.  As described in more detail below, on December 21,

2006, Rogan filed and caused to be filed an "AFFIDAVIT" in connection with that case in which

he averred, in pertinent part, that he was the "discretionary beneficiary" of the "Peter G. Rogan Irrevocable trust established in 1996," that he "do[es] not have and ha[s] never had any control . . . regarding the Irrevocable Trust and its income or the assets in the Trust" and that he has "no control over the Irrevocable Trust or its distribution to the beneficiaries."

     5.     One of Affiant's duties has been to assist the United States Attorney's Office for the Northern District of Illinois in the litigation of the civil matter identified in paragraph Four, above. In the course of working and assisting on that matter, I have reviewed many documents bearing the known signature of Peter G. Rogan and have thus become familiar with his signature. In reviewing the documents provided by Oceanic, I recognize the signature of Peter G. Rogan on the documents described in this affidavit. In addition, I displayed Oceanic documents that bear what I recognize to be Rogan's signature to a former employee and colleague of Rogan, who worked with Rogan for approximately seven years. He is familiar with Rogan's signature and handwriting. Upon inspection, he independently identified Rogan's signature and handwriting on the documents I displayed to him. Further, Rogan is a party defendant to another civil suit in post-judgement proceedings before the United States District Court for the Northern District of Illinois, captioned *Dexia Credit etc. v. Peter Rogan*, No. 02 C 8288. In connection with that suit, Rogan gave sworn testimony in a deposition on October 6, 2004 wherein he testified that he established the Trust identified in paragraph Three, above; that he was the "Settlor" of the Trust; that New World (which later became Oceanic) was the Trustee; that in establishing the Trust, he was "giving up complete control of this money as if it was never [his] . . . and . . . as if it was never [his] to begin with;" that he met with representatives of Oceanic in the Bahamas in December 2002; and that he had received distributions from the Trust as a "discretionary

beneficiary."

6.　　In connection with the establishment of the Trust, Rogan signed, completed,

and/or caused to be completed a number of documents including: a form entitled "Requirements

for New Clients," a "Deed of Settlement," and a letter entitled "Letter of Wishes of Settlor." The

"Requirements for New Clients" form recites that the purpose of the document is to gather

background information, references, and other information about prospective new clients seeking

to establish trusts. The "Requirements for New Clients" form contains the following answer in

response to New World's inquiry concerning "The purpose of establishing the Trust:"

> The purpose for establishing the Trust is to provide protection against future creditors (it
> is believed that there are no present creditors). The Trust vehicle and the Trustee were
> selected based on the best arrangement to achieve the goals of the Settlor.

7.　　The "Requirements for New Clients" form further reflects the following

information (in part) provided in response to New World's request for a "General description,

including valuation and source, of the assets which are expected to be added to the Trust:"

> The initial assets of which will be transferred to the Trust (on formation of the trust) will
> be 100% of the outstanding capital common stock of an I.B.C. [*i.e.*, International
> Business Companies] which has been formed under the laws of the Commonwealth of the
> Bahamas.
>
> The I.B.C. was funded with transfers of cash solely from the Settlor in November and
> December of 1995.

8.　　The "Requirements for New Clients" form further reflects the following

information (in part) provided in response to New World's request for "The name, street and

postal addresses and telefax or telephone contact of the Settlor . . .:"

> If oral message or inquiry: Please leave a message so that Settlor can personally call
> back. If call is returned by Fred M. Cuppy, Esq., or Troy H. Meyers, Jr., Esq., please
> deliver the message and converse freely with either of them. Do not withhold any

4

message waiting for Settlor to return the call.

If Written message, please mark the outside of the outer covering or envelope as follows:
    "PERSONAL AND CONFIDENTIAL
    TO PETER G. ROGAN ONLY"

9.      The "Requirements for New Clients" form provides further exposition of the

intent of Rogan as Settlor. In paragraph 10, New World requested "Details as to how the

Trustees are expected to deal with the assets." The response was in seven sub-paragraphs,

marked A. through G. Sub-paragraph G. states in relevant part:

> Provided however that the Trustee shall not distribute either income or capital of the
> Trust in accordance with the instructions of the beneficiary if it appears that the
> instructions of the beneficiary were made or delivered under legal, or physical duress, or
> are for the benefit of creditors of the beneficiary.

10.      The "Deed of Settlement," dated January 5, 1996, is approximately 71 pages in

length and bears the signature of Rogan on page 71. Listed as beneficiaries are Rogan, his wife,

Judith K. Rogan, and his children (described by name in the "Requirements for New Clients"

form). Among the documents produced by Oceanic to the United States are two checks both

dated January 5, 1996 drawn on Rogan's account at Northern Trust Bank (Sarasota, Florida) and

both payable to New World Trustees (Bahamas) Limited (or LTD): one for $10,000.00 as a cash

contribution to the Trust *corpus* (check number 155) and the other for $3,500.00 in payment of

various fees (check number 156).

11.      Another document, captioned "Agreement Relating to Shareholdings in

International Business Companies" was also executed by Rogan and sets forth that Rogan as

Settlor, and the Trustee, have agreed on the "status" of the International Business Companies that

are owned by the Trust.

12.     Another document executed by Rogan in connection with the establishment of the Trust is a "Letter of Wishes of Settlor" dated January 5, 1995 [*sic*] and signed by Rogan. The letter was addressed to the Managing Director of New World, as Trustee, and states in relevant part:

> Re: Peter G. Rogan Irrevocable Trust 001 Dated: January 5, 1996
>
> Please accept this Letter of Wishes and consider it valid until you receive a subsequent Letter of Wishes from me which changes the wishes contained in this letter.
>
> In your administration of the Trust, I wish that you would follow the terms of the Trust, subject to the following:
>
> 1.     Please distribute all of the income of the Trust to me upon receipt by the Trustee. I will provide you with the wire transfer information from time to time in order for you to accomplish the transfer of funds for my use.

It is apparent from the context of this document that the "1995" date is a typographical error and should be "1996."

13.     Paragraphs Two and Three of the "Letter of Wishes" describes further "wishes" of Rogan concerning a particular asset of the Trust:

> 2.     Please retain the stock of PRG GmbH, [*sic*; probably should read "PPR GmbH"] the Bahamian I.B.C., which was transferred to the Trustee at the formation of the Trust.
>
> 3.     Please do not replace the directors of PRG GmbH [*sic*; probably should read "PPR GmbH"] until and unless you receive written direction for such action from the Trust Protector.

## ROGAN DIRECTS DISTRIBUTIONS FROM THE TRUST, 1996 - 2006

14.     The records of the Trust maintained by Oceanic in the ordinary course of business reveal that between 1996 and at least 2004, Rogan directly or indirectly directed the Trustee to make distributions of approximately $8.15 million from the Trust to himself or to persons or

6

entities he specified (as discussed immediately below, a $3.4 million distribution in 1996 did not originally go through the Trustee, but was subsequently ratified by the Trustee). In chronological order they are as follows:

a.    **October 1996 - $3,400,000.00.**  During the period February to September 1998, Fred M. Cuppy, previously designated by Rogan as a person with whom the Trustee should converse freely concerning the Trust, was in communication with the Trustee.  In a series of letters dated during this period, Cuppy explained to the Trustee that he and Troy H. Myers, Jr. were the directors of PPR GmbH, that the stock of PPR GmbH was the only asset of the Trust, and that they had caused a distribution from the company that "because of time constraints . . . did not go through the trustee."  In a subsequent letter to the Trustee, Cuppy enclosed a letter from the "Grantor, Peter G. Rogan" and also enclosed a proposed form by which New World would ratify the "distribution that was sent direct to Mr. Rogan."  Trust records also include a letter dated October 12, 1996 addressed to the Trustee (New World) and signed by Rogan that states in one sentence, "I have asked Fred Cuppy to deliver this letter to you requesting that you distribute to me $3,400,00.00 from the Trust."  Trust records reflect that the Trust distributed this sum as "Income Distribution."  Rogan's accounting records, obtained during the above-described civil litigation,  reflect his receipt of $3,400,00.00 on October 15, 1996 "From OST," which Affiant believes stands for "Off Shore Trust."

7

b.    **November 5, 2002 - $150,000.00.**  By November 2002, Oceanic had assumed the role of Trustee previously held by New World.  On November 5, 2002, Rogan sent a fax to Charles Hepburn an employee of Oceanic.  Rogan stated: "At your convenience, please wire the amounts as designated on the attached pages to the named accounts.  Thank You. /s/ Peter G. Rogan."  Attached to the fax were two pages directing that $50,000.00 be wire transferred to a Chicago bank account in the name of "BFB Ltd," and that $100,000.00 be wire transferred to Judith K. Rogan's account at a brokerage firm.  Internal Oceanic documents reflect that on November 5, 2002, Mr. Hepburn complied with Rogan's instructions and wire transferred these amounts to the specified accounts, and communicated his compliance by return fax to Rogan.  Affiant has learned that "BFB Ltd." was then an entity used by Rogan to hold ownership of his forty-eight foot boat named "Fringe Benefit," and that upon receipt of the $50,000.00 in the account of BFB Ltd., a check for $40,204.91 was drawn on that account on November 6, 2002 payable to "Captain's Orders," a Valparaiso, Indiana company that maintained and serviced Rogan's boat.

c.    **November 13, 2002 - $250,000.00.**  On November 13, 2002, Rogan sent another fax to Charles Hepburn at Oceanic.  It read: "Previous transfers received on 11/5/02.  Thank you.  At your convenience please complete the attached two transfers Thank you.  Sincerely /s/ Peter G. Rogan."  Two attached pages instructed Hepburn to wire transfer $170,000.00 to an

8

account in the name of Bainbridge Management, Inc. and $80,000.00 to an

account in the name of Edgewater Property Company, both entities owned

or controlled by Rogan. Internal Oceanic records reflect that Hepburn

complied with Rogan's instructions on November 14, 2002.

d.    **December 24, 2002 - $3,000,000.00.** In late December 2002, Rogan

traveled to the Bahamas and met with Hepburn and other Oceanic

officials. Rogan's U.S. passport reflects that Rogan passed through

Bahamas Immigration on December 23, 2002.    On December 24, 2002,

Rogan sent Hepburn a fax that stated: "Charles - per our discussion please

wire transfer $3,000,000- to the account below. Hope you Kim + Bill have

a Happy Holiday Sincerely /s/ Peter." The account described was an

account held by Rogan at a Chicago bank. Internal Oceanic records reflect

that $3,000,000.00 was wire transferred as directed on December 27,

2002. However, in his October 2004 deposition in the *Dexia v. Rogan*

litigation, Rogan testified that he was called by someone in the fall of 2002

who advised him that there was approximately $4 million waiting for him.

Rogan further testified that he was too busy to deal with the $4 million

payment and told the caller just to hold on to the money. He also testified

there were subsequent phone calls and eventually he learned the caller was

Hepburn, who worked for the Trustee, and that Hepburn insisted that

Rogan travel to the Bahamas and bring his passport. Rogan testified that

he traveled to the Bahamas on a one day trip, that he met with Hepburn

9

and two other men, that they copied his passport, and that he returned home the same day with nothing. Subsequent to this trip, Rogan testified, he sent Hepburn instructions to wire $3,000,000.00 to his account. As it was, during the latter part of 2002, Rogan was in active negotiations with the United States Attorney's Office for the Northern District of Illinois to resolve a criminal prosecution against Bainbridge Management L.P., an entity he controlled. Bainbridge Management, L.P. entered a plea of guilty and agreed to pay restitution to the United States in the amount of $2.9 million. Rogan testified that he used the $3,000,000.00 distributed to him from the Trust to pay the $2.9 million restitution owed by Bainbridge Management, L.P. Rogan paid the restitution in January 2003.

e.  **January 15, 2003 - $50,000.00.**  On January 15, 2003, Rogan sent a fax to Hepburn that reads: "Charles - Can you please wire transfer $50,000.00 to the account below. Thank you. Sincerely /s/ Peter G. Rogan." The fax specified that the distribution should be sent to an account maintained by his wife, Judith K. Rogan, at a bank in Valparaiso, Indiana. Internal Oceanic records reflect that on January 15, 2003, this sum was wire transferred as Rogan instructed.

f.  **March 11, 2003 - $250,000.00.**  There does not appear to be a fax record among the documents produced by Oceanic regarding this particular transaction, but other Oceanic records reflect that on March 11, 2003, $250,000.00 was wire transferred to the account of Bainbridge

Management, Inc. with the notation "dist to be," which Affiant believes

means "distribution to beneficiary." Records of Fifth Third Bank in

Merrillville, Indiana relating to an account maintained by Bainbridge

Management, Inc. show receipt of a wire transfer from "Rogan Trust

Oceanic Bank and Trust . . ." in the amount of $249,988.00 on March 12,

2003. Bainbridge Management Inc. was owned or controlled by Rogan.

Indeed, the logo contained on the fax transmittal sheets bears the name

"Bainbridge Management, Inc." Furthermore, the "header" on the faxes

sent by Rogan to Oceanic bear the legend "Bainbridge Management" and a

phone/fax number associated with Bainbridge Management, Inc.

g.      **November 24, 2003 - $575,000.00.** On November 21, 2003, Rogan sent a

fax to Hepburn that stated: "Charles - Could you please complete the

attached three transactions at your convenience. If you have questions,

please call. Sincerely, /s/ Peter G. Rogan." The attachment specified three

separate wire transfers: one to the Bainbridge Management Inc. account at

Fifth Third Bank in Merrillville, Indiana in the amount of $50,000.00; the

second to an account maintained by Rogan at Bank One of Illinois in

Chicago in the amount of $225,000.00; and the third to the bank account

of Winston & Strawn (a Chicago law firm then representing Rogan) in the

amount of $300,000.00. According to internal Oceanic records, Hepburn

complied with Rogan's instructions on November 24, 2003. This "delay,"

Hepburn explained to Rogan by return fax, was because Hepburn had been

11

out of the office when Rogan's instructions arrived.

h.    **July 20, 2004 - $479,316.00.**  In the summer of 2004, Rogan was a party

defendant in the two civil lawsuits described above (and various of

Rogan's corporate and partnership entities were also party defendants in

the Dexia litigation).  During this time, discovery as permitted by the

federal rules of civil procedure was ongoing.  By September 2004, counsel

for Rogan's party opponents (the United States and Dexia) obtained a copy

of the "Deed of Settlement" as well as telephone toll records associated

with  Bainbridge Management, Inc.  These toll records would reflect the

date and the number dialed when a fax transmission was made on that line.

On July 20, 2004, a letter from Fred Cuppy was faxed to Charles Hepburn

at Oceanic which read in part: "I am faxing through wire numbers for fees

that Peter would like you to pay through his account and you are free to

give him a call to verify but he didn't want to have the call on his line due

to the current situation."  Together with Cuppy's letter was a one page

attachment directing that three wire transfers be made to two law firms:

one to the bank account of Winston & Strawn in the amount of

$360,188.00; the second to the bank account of Mayer, Brown, Rowe &

Maw (another Chicago law firm that represented Rogan) in the amount of

$31,115.00; and the third also to the bank account of Mayer, Brown, Rowe

& Maw in the amount of $88,013.00.  Internal Oceanic records reflect that

Hepburn complied with Rogan's and Cuppy's instructions on July 22,

12

2004, after verifying them with Cuppy on that date.

i.    Affiant has examined the materials produced by Oceanic and have located no record or document reflecting that any Oceanic personnel requested that Rogan travel to the Bahamas in December 2002, as Rogan testified. Further, other than the Trustee's redemptions of certain funds of the Trust after March 2006, Affiant has located no record or document reflecting that Oceanic personnel communicated with Rogan from time to time to advise him that the Trustee had, pursuant to its own independent discretion, decided to distribute Trust funds to Rogan.

j.    For the period between July 2004 and November 2006, Oceanic records do not reflect any further direct instructions from Rogan to the Trustee as described above. Instead, during this period, Fred Cuppy or Judith K. Rogan, wife of Rogan, communicated directly with the Trustee, thereby causing the distribution of at least $6.5 million from the Trust to accounts in Judith Rogan's name. Thereafter, Judith Rogan used these accounts to make payments to certain known creditors of Rogan and to Rogan himself.

**ROGAN IS SUED BY THE UNITED STATES, JUDGMENT IS ENTERED FOR THE UNITED STATES IN THE AMOUNT OF $64,259,032.50, AND THE UNITED STATES BEGINS COLLECTION EFFORTS.**

15.    On May 8, 2002, the United States filed a civil suit against Rogan (and others) alleging violations of the False Claims Act (Title 31, United States Code, Section 3729, *et seq.*) and also asserting common law fraud claims. *United States of America v. Peter Rogan*, No. 02 C 3310. The government was and is represented in this suit by the United States Attorney for the Northern

District of Illinois and his assistants. The government alleged that Rogan and others had engaged in a conspiracy to submit millions of dollars of false claims for Medicare and Medicaid reimbursement in connection with Rogan's operation of a now-closed Chicago hospital, Edgewater Medical Center. The government also alleged that Rogan had violated the Anti-Kickback Statute, Title 42, United State Code, Section 1320a-7b(b) and the Stark Statute, Title 42, United State Code, Section 1395nn.

16.     On September 29, 2006, following a bench trial, United States District Judge John Darrah entered judgment against Peter G. Rogan and in favor of the United States in the amount of $64,259,032.50. In rendering judgment for the United States, Judge Darrah issued an Opinion and Order in which he found that Rogan had testified falsely, destroyed documents, and obstructed justice. The opinion is reported as *United States v. Rogan*, 459 F. Supp.2d 692 (N.D. Ill. 2006). Rogan appealed from the judgment to the United States Court of Appeals for the Seventh Circuit. The Court of Appeals affirmed the district court judgment on February 28, 2008. This decision is reported as *United States v. Rogan*, 517 F.3d 449 (7th Cir. 2008).

17.     Following entry of the civil judgment, the United States began efforts to collect on the judgement entered against Rogan. In this regard, the United States has used various post-judgment procedures available under federal law, but as of the date of this Affidavit, Rogan has not paid anything toward satisfaction of this judgment. The post-judgment procedures employed by the United States to date have included depositions, citations, and subpoenas designed to discover the nature, extent, form, and location of assets owned or controlled by Rogan; however Rogan has frustrated the United States in its efforts to collect the money awarded it by the Court's judgment. Post-judgment procedures have also included motions seeking certain orders from the Court to

effectuate satisfaction of the judgment.  On November 6, 2006, The United States filed, "United States' Motion for Installment Payment Order," by which it sought an order from Judge Darrah directing Rogan to make installment payments on the judgment amount.  That motion asserted, among other things,  that it "appears that Rogan had access to many millions of dollars that have been held in or transferred to offshore accounts" and that Rogan has diverted or concealed assets.

18.     In support of this motion, on December 12, 2006, the United States filed the affidavit of Shari Smith Chizana, an employee of the United States Attorney's office (the "Chizana affidavit").  That affidavit states in part:

> 4. Trusts. Mr. Rogan is the discretionary beneficiary of the Peter G. Rogan Irrevocable Trust. He appears to readily have access to the assets of this trust as well as other trusts in the names of his children.  Based on the most recent records Rogan provided, there is between $30 and $35 million in these trusts.  Rogan's beneficial interest in the Peter G. Rogan Irrevocable Trust alone generates dividend and/or interest income in the amount of $760,000 per year.

19.     On December 21, 2006, Rogan, acting *pro se,* but apparently having at least some assistance of Canadian counsel, and in response and opposition to the Chizana affidavit, signed and filed and caused to be filed, an "AFFIDAVIT" with the Clerk of United States District Court for the Northern District of Illinois and served a copy upon counsel for the United States.  Rogan's affidavit, in which he verified  under penalty of perjury that his assertions were true and correct, stated in part:

> 6.     Concerning paragraph 4. of the Chizana Affidavit, I am a discretionary beneficiary of the Peter  G.  Rogan Irrevocable Trust established in 1996 (Irrevocable Trust").  I do not have and have never had any control or underlying financial records regarding the irrevocable Trust and its income or the assets in the Trust.  Even though I have no control over the Irrevocable trust or its distribution to the beneficiaries, since I was the settlor of the Trust in 1996, the U.S. agent of the Irrevocable Trust provides me with a form reporting the income for US tax purposes.  This is the only information I receive concerning the irrevocable Trust.  The forms for 2003, 2004, 2005 have been provided in the 2006 Information.  The Chizana Affidavit wherein it states the "he appears to readily have access to the assets of this trust as well as other trusts in

15

the names of his children" is without any factual basis and is totally false.

20.    Affiant has examined the Rogan Affidavit described above and the signature appearing thereon appears to be the signature of Peter G. Rogan. Rogan's former colleague, as described in Paragraph 5 above, also independently identified the signature on the Affidavit as being Peter G. Rogan's signature.

21.    Beginning in late 2007, approximately one year after Rogan filed his affidavit, Oceanic produced to the United States records relating to the Trust as described herein.

22.    The records produced by Oceanic reveal that in 2006, officials of Oceanic began inquiries into the Trust relationship and discovered that "Bainbridge Mgt. Inc.," listed in a credit card application of Rogan as his employer, had pleaded guilty to fraud charges and that Rogan himself was the defendant in a civil suit filed by the United States. Internally, Oceanic began to question the source of Rogan's wealth and Oceanic eventually decided it should no longer maintain the relationship. Oceanic began liquidating various mutual funds it held for the Trust. In October 2006, Oceanic informed Cuppy that "you (or I guess Mr. Rogan) will need to find new trustees as soon as possible." On or about November 23, 2006, two principals at Caledonia Corporate Management Group (Bahamas) became the new trustees while Oceanic resigned as such. As of December 11, 2006, the last of the funds held by Oceanic was distributed and Oceanic noted that its account was closed.

23.    Peter G. Rogan was born on February 26, 1946 in New York. He is college educated and has earned a Ph.D. in hospital administration. He is a United States citizen and has been issued a U.S. passport, but left the United States in or about October 2006, and has since resided in Canada and has traveled outside the United States.

16

24.     Based on the foregoing, there is probable cause to believe that on December 21, 2006, Peter G. Rogan filed and caused to be filed with the United States District Court for the Northern District of Illinois in the cause then pending captioned *United States v. Rogan*, No. 02 C 3310 an "AFFIDAVIT," in which Peter G. Rogan willfully subscribed as true material matters that he did not believe were true, namely:

a.      "I do not have and have never had any control . . . regarding the Irrevocable Trust and its income or the assets in the Trust."

b.      " . . . I have no control over the Irrevocable Trust or its distribution to the beneficiaries . . . . "

c.      "The Chizana Affidavit wherein it states that 'he appears to readily have access to the assets of this trust as well as other trusts in the names of his children' is without any factual basis and is totally false;"

in violation of Title 18, United States Code, Sections 1621;

and that on December 21, 2006, Peter G. Rogan did knowingly and corruptly endeavor to influence, obstruct and impede the due administration of justice in the cause then pending before the United States District Court for the Northern District of Illinois captioned *United States v. Rogan*, No. 02 C 3310, in that he filed and caused to be filed a sworn "AFFIDAVIT," by which he represented and attempted to persuade the Court and United States that:

a.      "I do not have and have never had any control . . . regarding the Irrevocable Trust and its income or the assets in the Trust."

b.      " . . . I have no control over the Irrevocable Trust or its distribution to the beneficiaries . . . ."

c.      "The Chizana Affidavit wherein it states that 'he appears to readily have access to the assets of this trust as well as other trusts in the names of his children' is without any factual basis and is totally false;"

in violation of Title 18, United States Code, Section 1503.

17

25.    Further Affiant sayeth not.

Kray Te

Subscribed and sworn to before me this
**2 3** day of May, 2008.

Martin C. Ashman
United States Magistrate Judge